Bergan, J.
The claimant’s intestate was drowned on May 23, 1946, while an epileptic patient at the Hudson Biver State Hospital. By the judgments of the Court of Claims the claims have been dismissed, and the question brought up on this appeal is the responsibility of the State for the death of this patient of whom it had assumed custodial care.
The decedent, Lawrence Sage, was twenty-four years old and for some time had been subject to epileptic seizures. He was not insane. He had first been admitted to the hospital as a patient in 1941, and from time to time, as improvement in his condition seemed to warrant, he had been paroled and during such periods he had worked.
At the time of his death his condition had improved to the extent that the hospital authorities had again under consideration his discharge on convalescent status which would involve his placement in employment. His mental condition at the time of the accident is stated by a physician at the hospital to have been “ good ”. It had been several weeks since he had an epileptic seizure. He was classified as a “ parole patient ” who had the privilege of walking unattended on the hospital grounds.
During the epileptic seizures, which came upon him suddenly and apparently without warning, the decedent would lose consciousness and fall. In these falls, usually face forward, he would sometimes injure his face or head. It was for this reason, mainly,' that custodial care had been thought advisable. At the time of his death he had been living in a cottage on the hospital grounds. He had been assigned to various tasks, including caddying at a golf course. It is conceded that work is a recommended therapy in epileptic cases.
Near the cottage where the decedent lived was a fenced field in which cattle were kept. The fence consisted of three wire strands and was about four feet in height. Close to the fence, but on the opposite side from the cottage, was a tub for watering the cattle. It was in this that decedent drowned.
*105 It was an ordinary bathtub and was connected with a pipe through which water could be turned on and off. The tub was 6 feet in length, 28% inches wide and 18% inches deep and had a capacity of about 21 cubic feet. The flow of water was controlled by a faucet extending over the side of the tub. The decedent had been seen sometimes to drink from the pipe which fed the watering tub, but no one witnessed the occurrence of the drowning.
On the morning of his death decedent had been directed by the attendant to count the laundry, which he did, and gave the attendant the count. After that, the attendant according to his written report which is in evidence, opened the front door of the cottage to allow the decedent to go out. The attention of the attendant was later called to the vicinity of the tub when he noticed cows crowding around it. Looking closer, he observed a body lying over the wire fence with the upper half of the body in the tub.
He immediately ran out, pulled the body, which he then identified as that of the decedent, out of the water and applied artificial respiration which failed. Dr. Bennett, a physician, stated in a report that he noticed “ the usual laceration of his chin which Sage nearly always received whenever he had a seizure ”. There was a small amount of blood on the side of the tub and in the water. The opinion of the physician was that he “ had almost certainly had a grand mal [epileptic] seizure which caused him to pitch forward into the tub.”
The statement of the attendant who was present does not indicate that he actually saw the decedent at the tub before he saw the body over the fence, but a statement of Dr. Bennett, who was not present and was called after the accident, is to the effect that “ Investigation indicated ” that the attendant saw the deceased “ filling the tub with water ”. The attendant was not called as a witness, his report being in evidence as part of the hospital records.
Dr. Bennett was called as a witness by the claimant but was not asked the basis of that part of his report which stated the attendant had seen the decedent at the water tank before the accident. The State rested without proof.
There is thus indirect and secondary proof that the attendant had seen the decedent at the tub. There is no proof in the record that the attendant or anyone at the hospital told the decedent to water the cattle or to turn on the water on this occasion. The court, therefore, properly refused to find on *106 the basis of this record either that there was a direction made to water cattle, or that this was the “ purpose ” for which the decedent was let out of the cottage.
Although the court refused to make these direct findings on request, it did find that “ at the time ” that the attendant “ directed the deceased to water the cattle ” he knew decedent was suffering from epilepsy. This is, in the main, a finding of the attendant’s knowledge of a physical condition, with the “ directed to ” merely descriptive of the “ time that and it is not an unequivocal finding of a direction given to the decedent by the attendant, especially in the light of the refusal to find this on specific request.
We think that this record will not sustain a finding that a direction was given to the decedent to water the cattle at the time of his death, but for the purpose of this discussion we will assume both that the decision of the court be construed as appellant argues it should be, to have found as a fact a direction to the decedent to water the cattle; and that the record would sustain such a finding.
Since the Constitution does not admit a liability of the State more broadly based than would be a private liability in like case, the main question here is the applicable rule of tort on these facts. It is familiar doctrine that a man placed in a responsible situation must guard against a risk of danger to others where reasonable foresight would suggest a good chance of occurrence and reasonable care suggests steps in avoidance.
As the doctrine of tort developed, predictability of casualty became the main element; and this in turn, as always in the case of social predictability, rested on the experience of society. The judgment required to be applied, as well as the risk of liability to be assumed, was based on what a man would regard as likely to happen, and this could be predicated only on what he knew, or should have learned, had happened in the past.
The rule of tort liability was never regarded as an insurance igainst all casualty; it was a selective process of protection against the injury to the innocent which common sense dictated should be guarded against. Hence the survival, even in today’s tort theory, of the sense of wrongdoing which, of course, involves some form or other of conscious and knowing risk.
When attempt is made to work a doctrine like this into the process of litigation to determine who is right or wrong about an occurrence, it depends always on someone else’s judgment about what should have been foreseen. This “ someone else’s *107 judgment ” in the system we have evolved is that of the court or a jury, but this in turn, as well as the judgment of the man on the scene, again calls for resort to the common and accepted experience of society.
The duty to foresee does not rise above this average level of expectation. This kind of a rule of law has so much elasticity that it cannot be defined in terms, but it can be described by saying that the level of expectation is what a court or jury later sets when the facts are in litigation. Both the person who has acted in the situation complained of as tort, and the judicial arbiters look to the same common level of experience for guidance in what to do.
A strong and sturdy tree by a public walk might give little concern; a tree by the walk that is dead and rotted might have to be viewed differently. A ditch dug in the back meadow might be regarded by a man as safe enough, but a ditch along a crowded sidewalk would be regarded by a jury, as well as the owner, quite differently. Sometimes casualties arise from the sturdiest trees and the most remote ditches, but these are not the casualties which incur tort liability.
Protection against every casualty without regard to predictability or fault may be an ultimate social achievement. It could not, however, be erected on our present concept of responsibility ; and, indeed, would not need the ministration of judges, but of auditors. It would turn away from presently accepted theory.
It is often argued that “ liberal ” legal policies in respect of tort liability, i.e., those which seem to broaden the base of what is compensable and raise the price of the penalty of carelessness, are moving in this direction. The fact is that a century or more ago, the failure to guard against dangers that ought to be foreseen was treated in the same spirit as now; what has changed in the accelerated pace and the enhanced mechanism utilized by society is merely the range and scope of the danger to be guarded against. The law of tort is more “ liberal ” precisely because experience shows more predictable casualties. Compare the failure to tie up the horse which ran away and injured the plaintiff, considered by the Court of Common Pleas in 1854 (McCahill v. Kipp, 2 E. D. Smith, 413) with the failure of a responsible third party to warn a workman engaged to thaw out a line by electricity of the presence of methane gas, an explosive which injured him, considered in 1949 in Appier v. Million (299 N. Y. 715).
*108 The judicial function is to appraise what is probable in given circumstances. This is often a matter of degree and of percentage involved in the chance that casualty might happen. It might have been imagined by a morbidly apprehensive person that a patient subject to epileptic fits might fall over the four-foot fence into a water tub on the other side and drown.
But this is so far beyond usual experience, so odd and strange an occurrence, as to approach the unique. To say the epileptic patient might at long intervals be expected to fall is not to say that all that happened here was to be predicted at the risk of liability. Our judgment is that a reasonably prudent hospital management would not have anticipated what happened and should not be expected to have anticipated it at the risk of liability for the occurrence.
The judgments should be affirmed, without costs.
Foster, P. J., Heffernan, Deyo and Coon, JJ., concur.
Judgments affirmed, without costs. [See post, p. 1063.]